United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID A. BLOOM,

    Plaintiff,

  v.

J.P. MORGAN CHASE & CO., and
J.P. MORGAN SECURITIES, INC.,

    Defendants.
                                  /

No. C 09-03418 WHA

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Defendants move for summary judgment on the ground that there is no genuine issue of material fact about whether their cause for firing plaintiff was pretext for age discrimination. They are wrong about this and, therefore, their motion is **DENIED**.

## STATEMENT

The following statement is the view of the summary judgment record most favorable to the party opposing summary judgment.

David Bloom was born on September 21, 1952. He has been an investment banker in the public finance sector for thirty years. In 1998, Mark Melio recruited Bloom to work for defendants. Melio and Bloom had met earlier in their careers when they both worked for Goldman Sachs. By 1998 Melio was the head of defendants' not-for-profit health-care group in the Public Finance Department. Bloom was hired as Vice President in the health-care

1  group. Defendants' Public Finance Department later became known as the Tax Exempt
2  Capital Markets Department. Bloom was 45 at the time.

3  While working for the defendant corporations from 1998 until 2008, Bloom provided
4  investment banking services to not-for-profit health-care organizations. Bloom received
5  various positive performance reviews that included assessments by Melio for 2000, 2001,
6  2005, 2006, and 2007 (*see* Bloom Decl. Exh. A–D; Melton Decl. Exh. E). Bloom was
7  promoted to managing director of the health-care group in the Tax Exempt Capital Markets
8  Department in 2007, when he was 54.

9  At the beginning of 2008, Mark Melio became the head of investment banking in the
10 Tax Exempt Capital Markets Department. At first, Bloom was going to be made co-head of
11 the health-care group, to replace Melio, with Mike Maloney (Melio Dep. 48:3–23; Melton
12 Decl. Exhs. H and I). Instead, Bloom was made "deputy head" of the health-care group; he
13 reported to Mike Maloney, who was solely made head of that group to replace Melio (Bloom
14 Dep. 24:18–25:6, 77:7–17; Maloney Dep. 26:3–10). Maloney had less experience than Bloom
15 and was younger (*compare* Serota Decl. Exh. A *with* Maloney Dep. 8:1–11:14; *id.* at 148:7–9).
16 Prior to the change in titles, Bloom was a managing director and Maloney was an executive
17 director, a lower title (*id.* at 31:12–21; Ellenbogen Dep. 79:22–24).

18 Melio told Bloom that this change was needed so Melio would have fewer people
19 reporting directly to him (Bloom Dep. 79:12–25). But Maloney was never aware that he was
20 originally going to be a co-head with Bloom (Maloney Dep. 26:18–27:16).

21 At about the time Bloom was made "deputy head" of the health-care group, Melio
22 reduced Bloom's compensation (as well as that of another individual) by $25,000 so that a
23 third, younger employee could make $50,000 more that year (Melio Dep. 50:22–52:17; Melton
24 Decl. Exhs. M and N at 2251). At the end of February 2008, Melio and Maloney exchanged a
25 few e-mails in which Melio thanked Maloney for "inheriting Dave [Bloom]" (Melton Decl.
26 Exh. O).

27 A lot of people lost their jobs in the Tax Exempt Capital Markets Department in 2008.
28 In addition to the change in titles described above at the very beginning of 2008, restructuring

United States District Court
For the Northern District of California

1  followed the defendants' merger with Bear Stearns, as well as streamlined the department after
2  downsizing (Ellenbogen Dep. 70:5–71:24; 117:5–13). During the restructuring, Melio led the
3  process of interviewing employees and potential employees from Bear Stearns for his group
4  and would then make recommendations to a committee; the committee always adopted Melio's
5  recommendations (Melio Dep. 74:8–76:11; 78:21–80:2; 92:22–97:11).

6  During the reduction in force that resulted from this restructuring, no banker over 50
7  from the Bear Stearns health-care group, or in the defendants' health-care group, was retained
8  other than Bloom. Five individuals were discharged, all 60 or older, and everyone else —
9  who, other than Bloom, were all under 50 — kept their jobs (FRE 1006 Summary). Bloom
10 stated under oath that he had at least two conversations with Melio and two with Maloney in
11 which they said that one particular employee, Nelson Luria, would not be retained because "he
12 was too old" (Bloom Dep. 64:21–65:20).

13 During this time, Bloom was removed as director and officer of the J.P. Morgan
14 Healthcare and Housing Funding Corporation (*id.* at 91:8–92:13). When the Bear Stearns
15 merger was in the works, but before it was finalized in the middle of 2008, Bloom acted as
16 interim head of the West Coast public finance group that was going to be headed by a former
17 Bear Stearns employee once the merger was complete, but this additional role, according to
18 Bloom, only lasted approximately two weeks and did not involve any additional
19 responsibilities or pay (Melio Dep. 87:19–88:15; Bloom Decl. ¶ 12).

20 Meanwhile, the United States Department of Justice, the Securities and Exchange
21 Commission, and the Internal Revenue Service had been investigating illegal practices in the
22 municipal derivatives industry (Gillis Dep. 7:8–25, 15:21–24). In conjunction with this
23 ongoing investigation, defendants undertook a parallel internal investigation, including a
24 review of audio-recordings of calls made to and from the municipal derivatives desk (*id.* at
25 12:11–24; Melio Dep. 107:3–16).

26 Melio was told that counsel needed to interview Bloom regarding conversations that he
27 had with the derivatives desk (*id.* at 108:2–20). Melio told Bloom he needed to travel to New
28 York to speak with counsel (*id.* at 110:20–24). Bloom met with Attorney Tom Mueller from

3

Wilmer Cutler Pickering Hale and Dorr LLP about the recordings in approximately August 2008 for about three and a half hours (*id.* at 116:22–25; Bloom Dep. 98:3–6, 108:8–10).

On September 8, 2008, a number of individuals — including managers and counsel but not Bloom — met to discuss Bloom and the recordings. This was a specially set meeting to discuss the recordings. They also discussed another employee, Eric Rockhold, who was similarly recorded having suspect conversations. The entire meeting lasted about one hour (Ellenbogen Dep. 170:15–16).

Some but not all of the participants at the meeting knew Bloom's age. There was no discussion of Bloom's "age" in this meeting, but his "seniority" was discussed. Melio testified as follows:

> Q. Any discussion of his seniority?
>
> A. I believe so.
>
> Q. What was that discussion?
>
> A. What added gravity to this meeting [w]as we were discussing [a] managing director[]. So [an] individual[] who had significant experience and tenure within the organization . . .

(Melio Dep. 134:11–17.) Despite a discussion at the meeting of next steps, Melio testified that he had "made up [his] mind to terminate Mr. Bloom *by the time of* the September 8 meeting" based on the recordings (*id.* at 185:8–12) (emphasis added). Melio had final authority to terminate Bloom after the meeting (*id.* at 146:6–9; *see also* Ellenbogen Dep. 190:3–5). Yet no one at the meeting had given Bloom an opportunity to offer an explanation as to his statements on the recordings (Melio Dep. 132:2–8; *see also* Ellenbogen Dep. 180:11–24).

The other banker discussed at the September 8 meeting was Eric Rockhold. He was eleven years younger than Bloom. He later received only a warning as a result of his communications on the recordings that were under review (Melio Dep. 138:16–137:7; Melton Decl. Exh. N).

A meeting was set up between Melio and Bloom in person in San Francisco for the morning of September 11, 2008, with Ellenbogen to participate by phone. Bloom was not told about the purpose of the meeting in advance (Bloom Dep. 103:23–104:8). On *September 9*,

4

Melio sent an e-mail to Zames requesting permission to hire a new executive director for the health-care group in San Francisco "given that we're going to terminate David Bloom" (Melton Decl. Exh. W). And Ellenbogen sent an e-mail to defendants' security personnel on *September 10* that requested security for Bloom's discharge (Melton Decl. Exh. U).

In the meeting on the morning of September 11, Bloom was asked to explain himself with regard to several transcripts. Bloom "said anything that I had to say had already been said to Mr. Mueller," the attorney who conducted the previous interview with Bloom concerning the recordings (Bloom Dep. 109:9–11). Melio then terminated Bloom's employment with defendants, saying "[s]enior management has decided that they have lost confidence in you and that . . . [y]ou're being terminated for cause" (*id.* at 109:22–110:4). The meeting was 17 minutes long (Melio Dep. 192:2–6; Melton Decl. Exh. X). Bloom was 55 at the time.

*Meanwhile*, Melio and Maloney were in the process of interviewing Peter Reilly to replace Bloom. Melio and Reilly knew each other because Reilly had earlier worked for Melio at J.P. Morgan. Melio testified that he believed his first contact with Reilly about coming back to work for Melio was "in the summer of 2008 when [Reilly] was let go from CitiGroup," his previous employer (Melio Dep. 208:10–13). Maloney also contacted Reilly about coming to work in defendants' health-care group:

> Q. [] When did you make that contact?
>
> A. Again, I don't remember the specific date. *Probably sometime in August.*
>
> Q. Okay. Was it after you spoke with Mr. Bloom about his meeting with the lawyers, or was it before?
>
> A. It was after that.
>
> Q. Okay. What prompted you to reach out to Peter Reilly?
>
> A. I think it was Mark [Melio] telling me that Dave [Bloom] was going to be terminated and a decision had been made.

(Maloney Dep. 126:8–127:1 (emphasis added).) Reilly testified that he got his first call from Maloney in "early September," and that "several days later" Maloney called back to see if Reilly could have dinner with Melio in San Francisco (Reilly Dep. 11:10, 12:12–13:14). This

5

1  was all before Bloom was discharged. The record would support (but not require) a finding
2  that the dinner occurred before the firing of Bloom (*see id.* at 13:16–23; 17:14–18:21).
3      On the day after Bloom's termination, September 12, Ellenbogen sent an e-mail to
4  Zames, that stated in part: "Matt . . . Please provide sign-off via email for the following hires:
5  [] Peter Reilly [] . . . Requested by Melio - In the process of getting vetted by internal counsel .
6  . ." (Melton Decl. Exh. V). On September 26, Melio wrote to Zames and others that
7  defendants planned to hire Reilly and that he believed Reilly "will be a terrific addition . . . as
8  he is a smart, personable, and hard-working *young* banker" (Melton Decl. Exh. S (emphasis
9  added)). Reilly was hired to replace Bloom in October 2008, when he was 43 years old.
10      In terms of internal accounting for Bloom's termination, defendants initially coded the
11  termination as voluntary within their human resources database, but that was "corrected" and
12  the code was changed to "misconduct" (Melton Decl. Exhs. ZZ, AA–BB). Similarly, a
13  government Form U5 was filed that said Bloom left voluntarily, but another was later filed that
14  stated: "Bloom was discharged for loss of confidence" (Bloom Decl. Exhs. E and F).
15      Bloom sued defendants for age discrimination under the Age Discrimination in
16  Employment Act of 1967 (29 U.S.C. 621–634) and the California Fair Employment and
17  Housing Act (Cal. Gov. Code § 12900 *et seq.*).

                \*                \*                \*

19      Defendants assert a somewhat different take on these events. They put a lot of
20  emphasis on the audio-recordings as the only reason Bloom was discharged. They did not
21  submit transcripts of the recordings. Instead, they point to characterizations of the recorded
22  conversations by individuals at the meeting on September 8. For example, Melio testified that
23  he had reviewed the transcripts of the calls and thought that Bloom had done several things
24  wrong, several things that violated defendants' code of conduct (Melio Dep. 115:7–116:13,
25  121:14–22). Specifically, Melio said:

> Q. At this time, having read the transcripts, what exactly did you believe Mr. Bloom had done wrong?
>
> A. Several things. First, I believe he witnessed and identified collusion and did not report it. Second, I believe he misused his relationships with financial advisors to what appears to be manipulate [sic] a bid process

> inappropriately. Three, he had a lack of appreciation for the fiduciary relationship that the financial advisor has with the client. And, four, he took a very active role — appears to have taken a very active role as a banker in trying to circumvent bid processes.
>
> Q. What do you mean by that last statement?
>
> A. That in the transcript I believe David was constructing, with the desk listening, what he thought might be appropriate structures for bid processes, which was — I don't believe bankers — to my knowledge, bankers don't do that. They typically rely on the experts and the desk to respond to how bids should be handled.

Melio expressed the same sentiments through specific examples from the tapes in his deposition. He also said about one of the transcripts, "the general theme of the transcript is . . . 'undue influence' over a financial advisor, not respecting financial advisor's [sic] fiduciary responsibility . . ." (*id.* at 175:5–12).

Participants at the meeting on September 8 testified that, when the group discussed Bloom's conversations, it "reached a consensus fairly quickly that these were troublesome and that we needed to take some type of action" (*id.* at 128:19–21; *see also* Bosland Dep. 35:11–15, 38:5–39:16; Zames Dep. 33:5–20). Defendants assert that Zames had final authority to discharge Bloom (*see id.* at 36:15–24), and that Zames did not know Bloom's age and had never met him. Defendants claim that Bloom offered no explanation whatsoever for his statements on the recordings at the meeting on September 11 (Melio Dep. 183:4–12, 183:22–184:4; *see also* Ellenbogen Dep. 193:15–16). Defendants also point out that Bloom never complained of age discrimination while he was employed by defendants, and that there is no evidence that Bloom's age was discussed openly at any of the relevant meetings.

**ANALYSIS**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). *All reasonable inferences, however, must be drawn in the light most favorable to the non-moving party. Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916,

7

1   922 (9th Cir. 2004).  That said, unsupported conjecture or conclusory statements cannot defeat
2   summary judgment.  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

3   Bloom sues under both federal and state law for age discrimination.  "California has
4   adopted the three-stage burden-shifting test established by the United States Supreme Court for
5   trying claims of discrimination, including age discrimination, based on a theory of disparate
6   treatment."  *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000).  To prove age discrimination,
7   Bloom must show that his age "actually played a role in [the employer's decisionmaking]
8   process and had a determinative influence on the outcome."  *Reeves v. Sanderson Plumbing
9   Prods., Inc.*, 530 U.S. 133, 141 (2000) (citation omitted; brackets in original).  In evaluating
10  age discrimination claims, courts in the Ninth Circuit "employ the familiar framework"
11  developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Pottenger v. Potlatch
12  Corp.*, 329 F.3d 740, 745 (9th Cir. 2003).

13  Bloom has made out a prima facie case of age discrimination.  Defendants concede this
14  much.  When Bloom's employment with defendants was terminated, he was 55 years old; his
15  performance reviews indicated that he was meeting or exceeding the requirements of the job;
16  he was discharged; and he was replaced by Peter Reilly, then 43 years old, a younger employee
17  with inferior qualifications.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir.
18  2000) (repeating required factors for prima facie case).  Yet, defendants have articulated a
19  legitimate, nondiscriminatory reason for terminating Bloom: that his recorded calls with the
20  derivatives desk violated company policies and demonstrated bad judgment.  *See Reeves*, 530
21  U.S. at 142 ("[the employer's] burden is one of production, not persuasion").  Plaintiff
22  concedes the same.

23  The main dispute is whether Bloom has come forward with evidence that defendants'
24  proffered reasons were a pretext for age discrimination.  In *Noyes v. Kelly Services*, the court
25  of appeals stated:

26  > [A] plaintiff can prove pretext in two ways: (1) *indirectly*, by showing that
>   the employer's proffered explanation is unworthy of credence because it is
27  > internally inconsistent or otherwise not believable, or (2) *directly*, by
>   showing that unlawful discrimination more likely motivated the employer.
28  > All of the evidence [as to pretext] — whether direct or indirect — is to be
>   considered cumulatively.  Where the evidence of pretext is circumstantial,

8

> rather than direct, the plaintiff must present specific and substantial facts showing that there is a genuine issue for trial. However, that requirement is tempered by our observation that . . . the burden on plaintiffs to raise a triable issue of fact as to pretext is hardly an onerous one.

488 F.3d 1163, 1170 (9th Cir. 2007) (emphasis in original; citations and quotation marks omitted).

Bloom makes a sufficient showing of pretext. A jury could reasonably believe that Melio contacted Reilly in the summer of 2008 with an intention of replacing Bloom, and that Maloney contacted Reilly prior to Bloom's termination in order to be ready to start the interview process for Reilly as soon as Bloom was gone. A jury could disbelieve defendants' characterization of Bloom's "promotion" to deputy head of the health-care group and find it to really be an effort to marginalize his position within the group. These issues involve credibility determinations that are for the jury to make. Furthermore, a jury could find it persuasive that the health-care group maintained no bankers over 50 (besides Bloom) after the restructuring in 2008, and that Bloom was not given a chance to defend himself with regard to the recordings because Melio was already prepared to push him out to make way for Reilly. There is evidence that Melio was given final authority to fire Bloom, and that he had made up his mind to do so even before the meeting on September 8 (*see* Melio Dep. 185:8–12). Plaintiff presents facts to support his version of what happened. He has carried his burden to show that defendants' explanation could be found by a jury to be pretext. This is sufficient to survive summary judgment. *See Pottenger*, 329 F.3d at 746 ("At the summary judgment stage, [plaintiff's] burden is not high.").

**CONCLUSION**

Defendants have not carried their burden to show that there are no genuine issues of material fact. A jury will have to decide. Please remember that at trial evidence does not always come in the same way the lawyer-prepared declarations pose it on summary judgment,

9

so a Rule 50 motion may possibly be in order despite the denial of summary judgment. Motion **DENIED**.

      **IT IS SO ORDERED.**

Dated:  November 5, 2010.

      WILLIAM ALSUP  
      UNITED STATES DISTRICT JUDGE